UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF NEW MEXICO

In re:
DOUGLAS F. VAUGHAN,
    Debtor.                                        No. 10-10763-s11

**MEMORANDUM OPINION ON U.S. TRUSTEE'S
MOTION TO APPOINT CHAPTER 11 TRUSTEE
AND MOTION TO CONVERT CASE TO CHAPTER 7**

    This matter came before the Court on May 7, 2010 and May 12, 2010 for final hearing on the U.S. Trustee's Motion to Appoint Chapter 11 Trustee (doc 183) and Motion to Convert Case to Chapter 7 (doc 184) and the Debtor's objection to both motions (doc 237).  The Note Holders Committee ("NHC") joined in both motions and expressed a preference for conversion.  (Docs 215, 216).  The Note Holders Committee for The Vaughan Company, Realtors case[1] ("VCR-NHC")(case no. 10-10759-s11) joined in both motions and also expressed a preference for conversion.  (Docs 199, 200).  BBVA Compass Bank filed a Response supporting the motions and stating a preference for conversion.  (Doc 202).  For the reasons set forth below, the Court finds that the Motion to Convert should be granted.  This is a core proceeding concerning administration of the estate.  28 U.S.C. § 157(b)(2)(A).

    The U.S. Trustee (sometimes "UST") appeared through its trial attorney Alice Nystel Page.  The NHC appeared through its

---

[1]On February 22, 2010 both Douglas Vaughan and the Vaughan Company, Realtors filed Chapter 11 petitions.  Douglas Vaughan owns 85% of the stock of Vaughan Company, Realtors.  The U.S. Trustee appointed an official committee of Note Holders in each case.

attorney George Moore.  The VCR-NHC appeared through its attorneys William Davis and Anne Goodman.  Douglas F. Vaughan ("Debtor") was self-represented.

Before launching into a detailed statement of facts, the Court will set forth its overall reasoning as a guide to the reader.  This Memorandum Opinion finds that Douglas Vaughan, a well-known, well-liked, and apparently very successful Albuquerque businessperson has been running a Ponzi scheme of considerable magnitude and sophistication for many years.  That scheme reached its inevitable demise in early 2010.  His operation of this scheme was done through deceit, misrepresentations, omissions and outright lies.  As frequently happens in cases of this type the government regulators targeted him for investigation.  He then filed a Chapter 11 bankruptcy to ward off his creditors, but refused to participate in the bankruptcy in a meaningful way.  He asserted his Fifth Amendment privilege against self incrimination and thereby hindered the United States Trustee from performing its oversight duties under the Bankruptcy Code.  Second, this Memorandum Opinion explains why the Court believes that the best interest of creditors requires an independent person to oversee the process in this case.  Third, it cites examples of material omissions from the filings.  Finally, it explains why conversion (thereby putting

Page -2-

the case into the hands of a chapter 7 trustee) is a better solution than the appointment of a chapter 11 trustee.

**FINDINGS OF FACT**

**THE U.S. TRUSTEE'S CASE**

The U.S. Trustee's first witness was Michael D'Angelo, a Certified Public Accountant and Certified Fraud Examiner. Mr. D'Angelo has a broad background in these areas including a Bachelor's Degree in accounting, four to five years of audit experience with KPMG, a Masters Degree in Business Administration, holding the position of chief financial officer in a private company for four years, and working in the Enforcement Division of the Securities and Exchange Commission ("SEC") since 1999. The Court approved Mr. D'Angelo as an expert

witness over the objection of the Debtor[2].  Mr. D'Angelo
testified extensively regarding UST Exhibits 1 through 5.

Mr. D'Angelo began working on his investigation of the
Debtor around January 1, 2010 and continued to devote 75% of his
time to it until around March 15, 2010.  During that time he
reviewed records subpoenaed from Debtor and his businesses
through Debtor's attorney and various banks.  He examined general
ledgers, work papers, emails, reports, financial reports, tax
returns, quarterly balance sheets and profit and loss statements,
a Private Placement Memorandum issued by Vaughan Capital[3], notes
from communications with banks, and complete records for several
checking accounts.  He also had testimonial evidence from

---

[2]The Debtor had two main objections to designation of the
witness as an expert.  First, a statement in a declaration given
to the Debtor before Mr. D'Angelo's deposition to advise the
Debtor what the subject matter of the deposition was going to be
stated that there were between $72 million and $80 million of
principal in outstanding promissory notes.  Debtor's objection
was that this wide gap between the numbers meant that the witness
was incapable of being accurate.  Mr. D'Angelo testified that the
two numbers were provided by Debtor's attorney to him pursuant to
a subpoena, and when questioned about the amounts the Debtor
refused to answer on Fifth Amendment grounds.  The second
objection was that Mr. D'Angelo claimed there was a $250,000 loan
from the Bank of Albuquerque to Vaughan Capital (another related
company) which Debtor argued was never made.  Mr. D'Angelo
testified that he relied on bank documents that showed a wire
transfer to Vaughan Capital as a "loan".  The Court found that
neither objection went to the witness' qualifications and
overruled the objection.

[3]Vaughan Capital, LLC is a New Mexico Limited Liability
Company formed on June 20, 2008.  Its sole initial member was
Phoenician Financial Services, LLC, which is wholly owned by
Douglas Vaughan.  See UST Exhibit 6, p. 1.

Page -4-

witnesses and access to bank records.  The Court found Mr.
D'Angelo to be intelligent, competent, diligent, thorough and
completely credible.

UST Exhibit 1 is the balance sheet as of December 31, 2008
and income statement for the year ending that date of The Vaughan
Company, Realtors (sometimes "Company").  The Company and Vaughan
Capital, LLC were the primary vehicles through which the many
investments were collected and distributed, with Mr. Vaughan
guaranteeing most of those investments.

UST Exhibit 1 showed current assets[4] of $14,351,631,
property, plant and equipment of $785,825 (net of depreciation),
and "other assets" of $200,000.  Among the current assets was an
overdrawn bank account at Charter Bank in the amount of
$1,415,536.  The current assets, however, also included
intercompany receivables from six related entities of $9,226,690
and a loan to Douglas Vaughan for $5,325,218; at this point, in
retrospect, these assets were worth nothing.  If adjusted to
exclude the intercompany receivables and loan, current assets
would be a negative $200,278.

---

[4]"Current assets are cash or items that can be converted
into cash within one year."  Murphy v. Meritor Savings Bank (In
re O'Day Corp.), 126 B.R. 370, 407 (Bankr. D. Mass. 1991).

Exhibit 1 also showed current liabilities[5] of $63,310,129[6], no long term liabilities, and negative equity (deficit) of $47,972,674. Part of the $47,972,674 deficit came from the 2008 year's $11,733,185 loss.

Exhibit 1's income statement showed total income of $6,228,836, of which only $11,147 was interest income. There were no other sources of investment income listed. There was a net loss from operations of the Company of $2,460,160. Therefore, the Company itself was not profitable or generating cash. In addition, there was an additional $9,273,326 of interest expense. The total net loss for the year was $11,733,485[7].

In summary, Exhibit 1 showed the Company had a dearth of working capital[8]. As of December 31, 2008, there was a serious

---

[5]"[C]urrent liabilities are obligations which come due within one year." Oday Corp., 126 B.R. at 407.

[6]Among the current liabilities are $62,844,446 of "debentures." During the trial there was some testimony that some of the notes were for periods of two or three years. The evidence did not establish that all $62,844,446 of the "debentures" were due in one year, so the categorization as a current liability may not be entirely correct.

[7]Compared to the income statement, the balance sheet's current year loss differs by a negligible $300.

[8]"Working capital is that portion of a firm's assets that are in relatively liquid form-the current assets such as cash, accounts receivable and inventory. Net working capital is the
(continued...)

question whether Vaughan Company, Realtors could meet its obligations as they became due. It also showed that the Company was losing almost $1 million per month in 2008.

UST Exhibit 2 is the Vaughan Company Realtors balance sheet as of December 31, 2009 and income statement for the year ending that date. It showed current assets of $13,416,746, property, plant and equipment of $685,108 (net of depreciation), and "other assets" of $200,000 (unchanged from the previous year). Among the current assets was an overdrawn bank account at Charter Bank in the amount of $3,823,656. The current assets, however, also included intercompany receivables from six related entities of $11,449,416 and a Loan to Douglas Vaughan for $5,372,718; at this point, in retrospect, these assets were worth nothing. If adjusted to exclude the intercompany receivables and loan, current assets would be a negative $3,405,389.

UST Exhibit 2 also showed current liabilities of $63,310,129[9], no long term liabilities, and negative equity (deficit) of $61,340,220. Part of the $61,340,220 deficit came from the 2009 year's $13,367,546 loss.

---

[8](...continued)
excess of current assets over current liabilities; it measures the ability of a firm to pay its debts as they mature." In re Lifschultz Fast Freight, 132 F.3d 339, 350 (7th Cir. 1997).

[9]Among the current liabilities are $74,391,523 of "debentures."

Case 10-10763-s7   Doc 343   Filed 05/20/10   Entered 05/20/10 15:28:17 Page 7 of 38

UST Exhibit 2's income statement showed total income of $4,812,716, of which only $2,569 was interest income; no other sources of investment income were listed. There was a net loss from operations of the company of $2,131,771. Therefore, the company itself was not profitable or generating cash. In addition, there was an additional $9,863,382 of interest expense. The total net loss for the year was $11,995,154[10].

In summary, Exhibit 2 shows a serious dearth of working capital. As of December 31, 2009, there was a serious question whether Vaughan Company, Realtors could meet its obligations as they became due. It also showed that the Company had been continuing to lose over $1 million per month.

Mr. D'Angelo summarized the important aspects of Exhibits 1 and 2 as follows. From December 2008 to December 2009 the promissory notes grew from $53 million to $74 million. The annual liability for interest payment on those notes went from $9.3 million in 2008 to $9.8 million in 2009 and he calculated that going forward interest requirements for 2010 would have been

---

[10]This figure differs from the balance sheet's $13,367,546 loss by $1,372,392, which is significant. This discrepancy was not addressed at the hearings. However, the Balance Sheet from Exhibit 2 is marked "Vaughan Company Realtors" while the Income Statement is marked "The Vaughan Company Combined." See also footnote 12 (discussing fact that income tax return is a consolidated tax return). This unanswered question is not material to the Court's decision.

Case 10-10763-s7    Doc 343    Filed 05/20/10    Entered 05/20/10 15:28:17 Page 8 of 38

$12 million[11].  Taking its operations alone, Vaughan Company
Realtors was losing money; it was obviously incapable of paying
any interest on the promissory notes.  The only way the Company
could meet its interest obligations was from funds from new
investors.

UST Exhibit 3 is the Vaughan Company Realtors balance sheet
as of January 31, 2010 and income statement for the month ending
that date.  Its contents are similar to UST Exhibits 1 and 2 so
will not be set out in detail.  The company lost $1,171,790 in
January, 2010.  Charter Bank's overdraft grew to $5,044,953 and
the Promissory note account grew by $173,328 to $74,564,851.

UST Exhibit 4 is the Vaughan Company Realtors consolidated[12]
federal and state income tax returns for calendar year 2008.  It
shows total income of $8,362,559, total expenses of $21,675,882
(including an interest expense of $10,544,314) for a net loss of
$13,313,323.  Statement 2 attached to the federal return is a
calculation of the net operating loss deduction.  It shows that
for every year from 1994 to 2007 Vaughan Company Realtors
incurred the following net losses:

---

[11]This figure is based on his calculated average weighted
interest rate of just over 17%.

[12]Form 851 attached to the federal income tax form 1120
lists affiliated subsidiary corporations included on the return:
Vaughan Commercial Properties, Vaughan Referral Company, Vaughan
Property Management and Vaughan Company Business Opportunities.
This explains why the tax reporting numbers are different from
the financial statements for 2008, UST Exhibit 1.

Page -9-

| YEAR | NET OPERATING LOSS |
|------|--------------------|
| 1994 | $            (203,875) |
| 1995 | $            (403,866) |
| 1996 | $            (501,609) |
| 1997 | $            (626,768) |
| 1998 | $            (786,818) |
| 1999 | $          (1,010,229) |
| 2000 | $          (1,484,680) |
| 2001 | $          (2,072,591) |
| 2002 | $          (3,257,108) |
| 2003 | $          (3,543,753) |
| 2004 | $          (4,041,048) |
| 2005 | $          (5,595,285) |
| 2006 | $          (7,461,409) |
| 2007 | $          (9,913,893) |

It demonstrates that losses increased each year from 1994 to 2007 as the business grew.

UST Exhibit 5, the only exhibit prepared by Mr. D'Angelo, is a diagram that graphically illustrates the cash flows for 2008 and 2009 from the Promissory Note investors to Vaughan Company Realtors ($29.4 million invested) and Vaughan Capital LLC investors to Vaughan Capital ($6.1 million invested) and the cash flows back from those entities to their respective investors (Vaughan Company Realtors returned $11.1 million of principal to investors; Vaughan Capital, LLC returned $310,000 of principal to investors). It also shows the cash flows back and forth between

Page -10-

Vaughan Company Realtors and Vaughan Capital LLC (Vaughan Capital LLC transferred $6.0 million[13] to Vaughan Company Realtors and Vaughan Company Realtors transferred $516,000 to Vaughan Capital LLC); the cash outflows from Vaughan Company Realtors and Vaughan Capital LLC to Douglas Vaughan ($877,000 from Vaughan Company Realtors and $83,000 from Vaughan Capital, LLC); the cash outflows from Vaughan Company Realtors to other Vaughan owned entities ($1.6 million); the cash outflows from Vaughan Company Realtors for operations of the company and interest payments on the promissory notes ($25.1 million); and the outflows from Vaughan Capital, LLC for "2 properties, a bank loan & other" ($91,000). All told, Vaughan Company Realtors ended up with a $3.8 million net cash outflow and Vaughan Capital, LLC ended up with a $132,000 cash inflow.

UST Exhibit 6 is a "Confidential Private Placement Memorandum" prepared by Vaughan Capital, LLC. The Memorandum states that 800 membership units will be offered at $12,500 per unit for an aggregate offering price of $10 million, with a minimum investment of $125,000 and a maximum of 24 investors. The cover sheet of the Memorandum states "<u>Vaughan Capital, LLC</u>, a

---

[13]This is the money that was invested specifically to be used to 1) buy distressed properties in New Mexico, Arizona and Nevada, 2) buy discounted loan portfolios, and 3) make high interest rate loans to qualified buyers with adequate collateral ("bridge loans" and "mezzanine financing"). <u>See</u> UST Exhibit 6, p. 5 (Private Placement Memorandum of Vaughan Capital LLC).

Case 10-10763-s7    Doc 343    Filed 05/20/10    Entered 05/20/10 15:28:17 Page 11 of 38

New Mexico limited liability company (the 'Company'), has been formed for the purpose of acquiring for investment purposes real property, mortgages, and to make commercial loans, commonly referred to as bridge loans or mezzanine financing." Article II on page 5 reiterates these purposes.

Article IV on page 6 describes how proceeds will be used and refers to Exhibit G. Exhibit G is a Pro Forma Cash Flow Statement for Vaughan Capital, LLC. Assumption 1 for the Cash Flow Statement is "Vaughan Capital will be adding assets (hard money loans, discounted mortgages, and real estate bought at a discount). It is assumed that each of these assets will comprise 33% of Vaughan Capital's assets." The five year cash flow projections show a negligible return in years one and two, but (assuming a full subscription of $10 million in units) profits of $1.4 million, $1.7 million, and $3.1 million in years three through five.

Exhibit B to the Memorandum is the Operating Agreement of Vaughan Capital, LLC. Article 1.5, "Business Plan" states:

> Company will engage in three (3) avenues of business or acquisition. (1) The Company will make hard money loans which will include bridge loans and/or provide mezzanine financing to commercial customers that are qualified for the loans, and in most cases collateralized by second mortgages on real property; (2) the Company will acquire real properties ...; and (3) the Company will attempt to buy portfolios of residential loans at deeply discounted prices ...

Page -12-

Mr. D'Angelo reviewed 100% of the transactions of Vaughan Capital, LLC through bank records.  He concluded, and the Court so finds, that $6.1 million was invested in Vaughan Capital, LLC and $6.0 million went directly to Vaughan Company Realtors to meet its cash flow needs relating primarily to payment of investor's promissory notes.  Vaughan Capital purchased two[14] houses and did not make any hard money loans or acquire any portfolios of residential loans.  See also UST Exhibit 5.

The U.S. Trustee called several investors as witnesses: Donald W. Duke, Ricky D. Hewes, Philip H. Dugan, and Larry Turner.  Their testimonies were all credible and consistent with each other.  They generally established: they were all friends of acquaintances of Debtor who they believed was a successful businessperson; they all trusted Debtor; they were attracted by the comparatively high rates of return; they believed their promissory notes were secured by a deed of trust, although none knew what that was or asked to see further documents; none had received any literature about the promissory notes before investing or financial reports after investing; those that had invested in Vaughan Capital, LLC assumed their investments were secured by the distressed properties that were to be purchased

---

[14]Mr. Vaughan argued that three houses were purchased, but provided no details or documentation.  Considering the use of the rest of the money, whether there were two or three houses is not really meaningful.

and were unaware that their investments could be loaned on an
unsecured basis to related Vaughan companies; all had invested a
substantial portion of their total net worth; all felt betrayed;
and none of them trusted the Debtor to repay them.

UST Exhibit 27 is a UCC Financing Statement filed with the
New Mexico Secretary of State on February 19, 2010.  The secured
party is Abbas J. Ansari.  The Debtors are Vaughan Company
Realtors and Douglas Vaughan.  The collateral is a 53% interest
in the limited liability company known as Oakwood Investment
Group, LLC, a New Mexico Limited Liability Company.  Documents
attached show that a 15.5% interest in this LLC was pledged as
collateral for a note dated November 5, 2004 and that another
37.5% interest was pledged as collateral for a note dated
February 8, 2010.  Debtor did not list any ownership interest in
the Oakwood Investment Group, LLC on his schedule of assets.  The
Vaughan Company Realtors also did not list any ownership interest
in this asset on its schedule of assets.  Debtor did not disclose
this transfer on his statement of financial affairs.  Debtor did
list Abbas J. Ansari as a creditor on his Schedule D but did not
include Oakwood Investment Group, LLC in the description of
collateral, and stated that the debt was incurred through
12/31/2009.  At the hearing, Debtor argued that this transaction
occurred over ten years ago but produced no evidence on the
point.  Therefore, the Court finds that the Debtor omitted either

Page -14-

or both an asset and a transfer from his statements and schedules.  Also, due to the timing of the transfer (14 days prepetition), the Court does not find it credible that Debtor would simply forget it.

UST Exhibit 23 is a transcript of Debtor's section 341 meeting of creditors.  Debtor invoked the Fifth Amendment privilege 121 times in response to almost every question asked.  Specifically, he refused to answer questions about: whether the statements and schedules were true and complete, whether any amendments were needed, when various bank and stock accounts were closed, where the money went from those closed accounts, whether there were any transfers of amounts over $10,000, the identity of other members or partners in various entities listed on the schedule of assets, how the entities were valued, the purposes of these entities, whether these entities had assets or were operating, where the records were located for these entities, why related companies owed him money or from what period of time, whether he received salaries from any of his companies or whether the W-2's issued by those companies were accurate, whether Schedule D was correct, who Suzie Fairchild was[15], whether he owned or ever owned certain specific parcels of real estate or

---

[15]According to his Statement of Financial Affairs Suzie Fairchild was his girlfriend.  Debtor gave her a Corvette convertible in July, 2009 for her birthday, and he transferred a house (allegedly with little or no equity) back to her in February, 2010.

ever transferred any of them to any entity he had formed, whether he had executed mortgages or for what purposes, whether he had made any transfers over $5,475 in the 90 days preceding the petition, how much Debtor gambled in Las Vegas[16] or at what casinos, what happened to shares of stock he listed as owning in a June 1, 2009 financial statement, whether he had received any rents from townhouses since the filing of the bankruptcy, or what plans he had to reorganize.

**THE DEBTOR'S DEFENSE**

The Debtor elicited the testimony of 3 investors: James R. Philp, Kurt Plouff and Fred Mossman.  The United States Trustee also consented to Debtor's reading three affidavits of other investors into the record.  Exhibits V1, V2 and V3.  Their testimonies were marginally credible and consistent with each other.  They generally established: they were all good friends of Debtor who they believed was a very successful businessperson; they all trusted Debtor to repay them despite the fact that he had voluntarily filed bankruptcy; they all expressed their preference that the Debtor remain in possession as a Chapter 11 debtor despite their obvious unfamiliarity with bankruptcy; they all testified that conversion to a Chapter 7 would guarantee that

---

[16]The Statement of Financial Affairs discloses gambling losses.

Case 10-10763-s7   Doc 343   Filed 05/20/10   Entered 05/20/10 15:28:17 Page 16 of 38

they would receive less on their claims[17] than if the Debtor

would be allowed to proceed with his "plan"[18]; and they all

testified that they had reviewed Debtor's plan with him and

thought it looked plausible and reasonable, and was the best

opportunity for them to get paid.  None of them had seen Debtor's

or the related companies' financial statements.  None had heard

the evidence produced by the United States Trustee in the case.

Debtor's obvious purpose in calling these witnesses was to

establish his character as a trustworthy individual and to

establish that creditors with substantial claims wanted him to

remain in control of the case.[19]  While there is no question that

---

[17]Debtor asked each investor witness how he (the witness)
would fare on his claim if a conversion were ordered.  This
question demonstrates a fundamental ignorance of the Bankruptcy
Code.  There is no rule as such that a Chapter 7 estate pays less
than a Chapter 11 reorganization.  A creditor's chance of getting
paid depends primarily on the financial condition of the debtor
as it enters bankruptcy, not the chapter it elects to file under.

[18]The "plan" is discussed below.

[19]Debtor had a third purpose in eliciting their testimony,
which was to rescue his reputation.  Albuquerque media have
continually reported on allegations of Debtor's improper dealings
(including a Ponzi scheme), government searches of his office and
home, etc.  One item sensationally reported was that of a "secret
room" in his home which contained a safe.  On this issue he
called Mr. Mossman, one of the major homebuilders in the
Albuquerque area, who testified that such rooms are commonplace
in luxury homes in Albuquerque.  Mr. Mossman also testified that
he had seen the secret room, and that it was in effect about
three foot square, with much of the space taken up by a safe.
One of the Court's staff appears to have most accurately
characterized the secret room as "a linen closet with a lock on
it".

Page  -17-

each of the three witnesses testified completely honestly and
sincerely, the Court puts little weight on any of these
witnesses' testimony given their fundamental lack of familiarity
with critical underlying facts.

After Debtor rested his case, the Court inquired whether he
had intended to put on any evidence of a possible plan of
repayment to creditors.  Debtor responded that he was working on
it and that it was substantially finished but not cosmetically
proper, and it would be filed by the due date.  The Court
clarified that the "due date" he referenced was really only the
deadline for exclusivity for filing a plan, and informed him that
if he had a plan, now was the time to present it.  Debtor was
allowed to reopen his case to present his plan.  The plan
consists of a one page spreadsheet that is a four year projection
of amounts he could repay creditors if he is allowed to remain a
debtor-in-possession.  Exhibit V6.

The plan has three fundamental assumptions.  First, NAI
Vaughan Management[20] will be renamed "Premier Asset Management"
and somehow supply an undefined amount of operating capital on
unknown terms for an unknown period of time.  Second, "free and
clear rentals"[21] will be borrowed against to supply an undefined

---

[20]Debtor's schedules list NAI Vaughan Management, LLC as a
100% owned limited liability company worth $200,000.

[21]The plan does not show income from rentals and does not
(continued...)

amount of operating capital on unknown terms for an unknown
period of time.  Third, Debtor will organize a new company and
keep 50% of the stock and issue 50% of the stock to investors.
The plan is silent as to the dollar amount of this stock
offering.

Before the Court gets into the details of the plan, it has
serious questions about the assumptions.  Is NAI Vaughan
Management being renamed to conceal the identity of its
principals or its connection to the Debtor?  How does the Debtor
assume that he can exit bankruptcy with a $200,000 asset (NAI
Vaughan Management) to use as his own by pledging it before[22]
paying creditors?  Are the rentals acquired by the new entity?
How can Debtor issue stock in a new company when he is under an
injunction[23] by the United States District Court to not offer or
issue any security without a registration statement?  Does Debtor
assume that he can get a plan approved without disclosing his
problems with the SEC?  On what does Debtor base his assumption

_____

[21](...continued)
disclose where the rents go.  Furthermore, Debtor's Schedule A
does not list any rental properties free and clear of liens.  In
fact, none of them even have equity.  See, e.g., UST Exhibit 18,
Doc 94 (nine rentals on Fruit Street each worth $135,000 with
$78,066,363 liens against them.)

[22]When asked by the Court during his presentation of the
plan, Debtor admitted that the plan would probably not pay
creditors in full during his lifetime.

[23]The injunction is UST Exhibit 24.

that any informed reasonable investor would invest money in a new company, 50% owned by a person that has run a business enterprise that was a textbook Ponzi scheme that has suffered mounting losses every year for at least 16 years?  Why would any informed reasonable investor invest money in a new company, 50% of whose profits are forever pledged to pay off the creditors of the 50% owner of the company?

The plan itself contemplates two methods to pay creditors. First, the new company will be engaged in the sale of real estate.  Second, Debtor will set up "ancillary companies" starting in year two to add profits to the undertaking.

Regarding the new company, the plan states that during the first year thirty real estate agents will come to work for Debtor and each will sell $3 million dollars of real estate[24].  The new company would receive 30% of the agents' commissions.  After payments of commissions and overhead[25], the new entity would have $390,000 of net profit[26].  Fifty percent, or $195,000 would be

---

[24]Debtor admits that he anticipates that the thirty best "superstar" real estate agents in the state will eagerly join his company.  Debtor stated that the average house in Albuquerque sells for $250,000.  His plan therefore anticipates that each real estate agent will sell one house per month.

[25]Debtor does not disclose if he receives compensation as part of the overhead, or in what amount, or for what duties.

[26]The plan has no provision for payment of income taxes, so the $390,000 figure is inflated.  So, all numbers projected for all following years are also inflated.  Any number therefore
(continued...)

paid to the creditors.  The plan is silent on what happens to the
other $195,000 but the Court presumes that it would be
distributed to the stockholders of the new entity, $97,500 to the
new investors and $97,500 to Debtor[27].

In the second year, the plan anticipates that twenty
additional real estate agents will join the new company and they
also will each sell $3 million of real estate and the resulting
profit would be $600,000.  In addition, Debtor will start up a
title company that will profit $200,000, a mortgage company that
will profit $150,000, and a commercial division that will profit
$100,000.  During year two Debtor will start organizing new
investment LLC's to invest in special situations[28] such as "fix up

---

[26](...continued)
should be assumed to be before tax.

[27]Assuming that there are $97 million of claims ($86 million
of secured claims and $11 million of unsecured claims, as set
forth on Debtor's Summary of Schedules, Doc 94, UST Exhibit 18)
means that creditors would receive a dividend of 0.20% during the
first year.  Meanwhile, Debtor is concurrently presumably
receiving a salary for running the new entity and receiving a
profit of $97,500.  The Court doubts that creditors would vote
for this plan.

[28]Compare to UST Exhibit 6 (Private Placement Memorandum of
Vaughan Capital LLC)(LLC to invest in foreclosed properties in
Nevada, Arizona and New Mexico, buy discounted loan portfolios
and supply hard money financing).  Unique, unusual, exotic or
even bizarre investment schemes are often the subject of Ponzi
schemes.  See, e.g., Cunningham v. Brown, 265 U.S. 1, 7 (1924)
(scheme purporting to buy international postal coupons in foreign
countries and sell them in other countries at 100 per cent
profit, made possible by the excessive differences in the rates
of exchange following the war. This is the case from which the
(continued...)

and flips", "discounted mortgages", etc. and this will profit $100,000.  Therefore, the second year total profit for all activities would be $1.25 million and $625,000[29] would be paid to investors.  Debtor would presumably receive salaries from all the entities and take home $312,500 of the profit of the new company.

Years three and four continue along the same lines, with the number of agents increasing to seventy, then one hundred, the new companies profits increasing to $840,000 then $1.2 million, and ancillary companies' profits increasing to $1 million then $1.65

---

[28](...continued)
term "Ponzi scheme" arose.  "The litigation grows out of the remarkable criminal financial career of Charles Ponzi."); <u>Securities and Exchange Comm. v. J.T. Wallenbrock and Assoc.</u>, 313 F.3d 532, 535 (9th Cir. 2002)("Wallenbrock sold promissory notes ostensibly secured by the accounts receivable of Malaysian latex glove manufacturers."); <u>United States v. Treadwell</u>, 593 F.3d 990, 993 n. 2 (9th Cir. 2010):

> It has been reported that Albanian pyramid schemes netted a purported $1.2 billion after the fall of Communism in the 1980s, and that a Florida church in the 1990s amassed $500 million by promising that God would double the money of pious investors.  Alex Altman, <u>A Brief History Of: Ponzi Schemes</u>, TIME, Jan. 8, 2009, at 13.  Lest one think Ponzi schemes are too simple and obvious to bamboozle the financially savvy, an oil-drilling swindle in the 1970s duped top executives at Pepsico, Time, and General Electric, as well as the chairman of U.S. Trust, the president of First Boston Corp., and an author of several books on Wall Street finance.  <u>See</u> Donald H. Dunn, <u>Ponzi! The Boston Swindler</u> xi-xii (1975).  Most recently, the 2008 collapse of Bernard "Bernie" Madoff's grandiose Ponzi scheme resulted in over $50 billion in investor losses, a 150-year prison sentence for Madoff, and numerous investor lawsuits that predictably will take years for resolution.

[29]This would be a 0.64% return to creditors in year two.

million.  The totals paid to creditors would be $920,000[30] in year three and $1.425[31] million in year four.  Debtor would take home profits of $460,000 plus salaries in year three and profits of $712,500 plus salaries in year four.  So, all told, after four years of this plan the creditors would have cumulatively received $3,165,000[32] and Debtor would have received $1,582,500.

Debtor testified at the hearing regarding his plan.  He believes that the figures are conservative, achievable and reasonable.  He claims that he has had such success in the past starting similar types of organizations.  The Court finds these projections fanciful at best.  They show a total disconnect from economic reality.  A review of the plan suggests that Debtor is trying to rebuild the hugely unsuccessful empire he controlled before bankruptcy.  If it were so easy to make the fantastic sums as set forth in this plan there would be no reason for the Debtor's and Debtor's companies to be massively insolvent and in Chapter 11.  This plan is not feasible and it also violates the absolute priority rule (11 U.S.C. § 1129(b)(2)(B)(ii)).  It is unconfirmable.

**CONCLUSIONS OF LAW**

---

[30]This would be a 0.95% return to creditors in year three.

[31]This would be a 1.47% return to creditors in year four.

[32]This would be a total four year return of 3.26%.

Page  -23-

The United States Trustee has moved to appoint a Chapter 11 Trustee or to convert this case to Chapter 7. These actions are governed by 11 U.S.C. § 1104 and § 1112. Section 1104, **Appointment of trustee or examiner**, provides, in part:

> (a) At any time after the commencement of the case but before confirmation of a plan, on request of a party in interest or the United States trustee, and after notice and a hearing, the court shall order the appointment of a trustee--
>> (1) for cause, including fraud, dishonesty, incompetence, or gross mismanagement of the affairs of the debtor by current management, either before or after the commencement of the case, or similar cause, but not including the number of holders of securities of the debtor or the amount of assets or liabilities of the debtor;
>> (2) if such appointment is in the interests of creditors, any equity security holders, and other interests of the estate, without regard to the number of holders of securities of the debtor or the amount of assets or liabilities of the debtor; or
>> (3) if grounds exist to convert or dismiss the case under section 1112, but the court determines that the appointment of a trustee or an examiner is in the best interests of creditors and the estate.

Section 1112, **Conversion or dismissal**, provides, in part:

> ...
> (b) (1) Except as provided in paragraph (2) of this subsection, subsection (c) of this section, and section 1104(a)(3), on request of a party in interest, and after notice and a hearing, absent unusual circumstances specifically identified by the court that establish that the requested conversion or dismissal is not in the best interests of creditors and the estate, the court shall convert a case under this chapter to a case under chapter 7 or dismiss a case under this chapter, whichever is in the best interests of creditors and the estate, if the movant establishes cause.

Page -24-

(2) The relief provided in paragraph (1) shall
not[33] be granted absent unusual circumstances
specifically identified by the court that
establish that such relief is not in the best
interests of creditors and the estate, if the
debtor or another party in interest objects and
establishes that--
(A) there is a reasonable likelihood that a plan
will be confirmed within the timeframes
established in sections 1121(e) and 1129(e) of
this title, or if such sections do not apply,
within a reasonable period of time; and
(B) the grounds for granting such relief include
an act or omission of the debtor other than under
paragraph (4)(A)--
        (I) for which there exists a reasonable
        justification for the act or omission; and
        (ii) that will be cured within a reasonable
        period of time fixed by the court.
...
(4)  For purposes of this subsection, the term
'cause' includes--
...
(H)  failure timely to provide information or
attend meetings reasonably requested by the United
States trustee[.]

## I.    MOTION TO APPOINT TRUSTEE

The U.S. Trustee proved that Debtor was the principal in a

Ponzi scheme.  Ponzi schemes are fraudulent.  Fraud, before or

---

[33]Thus in the original.  The "not" appears to be another of
the drafting errors in the statute resulting from Congress'
failure to proofread the statute before passing it.  (Other
examples are cited in In re Martin, 424 B.R. 496, 506-07 nn. 8
and 9 (Bankr. D. N.M. 2010)).  Not disregarding the "not" leads
to a logical but absurd interpretation of the statute; to wit,
dismissal or conversion shall be granted where unusual
circumstances establish that dismissal or conversion is not in
the best interests of the creditors and the estate.  7 Collier on
Bankruptcy ¶ 1112.05[2] (Alan N. Resnick and Henry J. Sommer,
eds., 16th ed.).   As the authors of Collier suggest, the most
cogent approach to the statute is that taken by the court in In
re Orbit Petroleum, Inc., 395 B.R. 145, 147 (Bankr. D. N.M.,
2008), which simply reads the "not" out of the statute.

Page  -25-

after the filing of a bankruptcy case, is a ground to appoint a
trustee.  Appointment would also be in the best interest of
creditors.  Therefore, the Court can grant the U.S. Trustee's
Motion to Appoint a Trustee.

**A.**   **PONZI SCHEME**

> A "Ponzi" scheme, as that term is generally used,
> refers to an investment scheme in which returns to
> investors are not financed through the success of the
> underlying business venture, but are taken from
> principal sums of newly attracted investments.
> Typically, investors are promised large returns for
> their investments.  Initial investors are actually paid
> the promised returns, which attract additional
> investors.

Sender v. The Nancy Elizabeth R. Heggland Family Trust (In re

Hedged-Investment Associates, Inc.), 48 F.3d 470, 471 n. 2 (10th

Cir. 1995)(citing In re Independent Clearing House Co., 41 B.R.

985, 994 n. 12 (Bankr. D. Utah 1984)).  See also McHale v. Huff

(In re Huff), 109 B.R. 506, 512 (Bankr. S.D. Fla. 1989):

> A ponzi scheme is a scheme whereby a corporation
> operates and continues to operate at a loss.  The
> corporation gives the appearance of being profitable by
> obtaining new investors and using those investments to
> pay for the high premiums promised to earlier
> investors.  The effect of such a scheme is to put the
> corporation farther and farther into debt by incurring
> more and more liability and to give the corporation the
> false appearance of profitability in order to obtain
> new investors.

In order to prove that a Debtor engaged in a Ponzi scheme,

the plaintiff must prove: "(1) deposits were made by investors;

(2) the Debtor conducted little or no legitimate business

operations as represented to investors; (3) the purported

business operations of the Debtor produced little or no profits or earnings; and (4) the source of payments to investors was from cash infused by new investors." Reiser v. Hayslip (In re Canyon Systems Corp.), 343 B.R. 615, 630 (Bankr. S.D. Ohio 2006). See also Floyd v. Dunson (In re Ramirez Rodriquez), 209 B.R. 424, 431 (Bankr. S.D. Tex. 1997)(same 4 part inquiry).

Under the two descriptions and one test listed above, Debtor was engaged in a Ponzi scheme. Debtor's business entities were not successful and did not generate cash. In fact, they lost money continuously and in increasing amounts from 1994 to date. The only way the businesses were able to continue in operation was from the infusion of funds from investors who were promised high rates of return on their investments. The funds invested were not utilized as represented; rather, they went to pay the high rates of returns to the prior investors. This is a textbook example of a Ponzi scheme. See Cuthill v. Greenmark, LLC (In re World Vision Entertainment, Inc.), 275 B.R. 641, 656-57 (Bankr. M.D. Fla. 2002)(Describing a "textbook" Ponzi scheme as follows:

> None of the debtor's investments ever produced any income or revenue. The debtor's primary source of funds was through the sale of its promissory notes. The debtor used funds invested by new investors to make interest and principal payments to earlier investors. Any remaining funds were used to pay general and administrative expenses such as officer salaries and rent, to make occasional investments in companies not expected to generate any substantial return, and to enrich the debtor's insiders.)

**B.    FRAUD**

Ponzi schemes are fraudulent.  Donell v. Kowell, 533 F.3d 762, 767 n. 2 (9th Cir.), cert. denied, 129 S.Ct. 640 (2008):

> A Ponzi scheme is a financial fraud that induces investment by promising extremely high, risk-free returns, usually in a short time period, from an allegedly legitimate business venture.  "The fraud consists of funnelling proceeds received from new investors to previous investors in the guise of profits from the alleged business venture, thereby cultivating an illusion that a legitimate profit-making business opportunity exists and inducing further investment."  In re United Energy Corp., 944 F.2d 589, 590 n. 1 (9th Cir. 1991).

See also World Vision Entertainment, 275 B.R. at 656 ("A Ponzi scheme is by definition fraudulent."); Ramirez Rodriquez, 209 B.R. at 430 ("A Ponzi scheme is a fraudulent investment arrangement whereby an entity makes payments to investors from monies obtained from later investors rather than from any 'profits' of the underlying business venture.")(Citation omitted.)

## C.    OTHER GROUNDS TO APPOINT A TRUSTEE

Grounds also exist under 11 U.S.C. § 1104(a)(2) to appoint a trustee.  Debtor's refusal to testify at the first meeting of creditors suggests that appointment of a trustee would be in the best interest of the creditors.  Tradex Corp. v. Morse (In re Tradex Corp.), 339 B.R. 823, 834 (D. Mass. 2006)(unwillingness to testify prevents the court and creditors from receiving information from the person entrusted to act as a fiduciary). Without a trustee to verify or reconstruct Debtor's assets and

Page -28-

transfers, funds otherwise available to creditors might remain undiscovered.

A failure to provide accurate schedules to the court has been deemed sufficient "cause" under § 1104(a)(1) to appoint a trustee. In re Plaza de Retiro, Inc., 417 B.R. 632, 641 (Bankr. D. N.M. 2009). As previously described, Debtor failed to schedule an asset (his interest in Oakwood Investment Group, LLC) and/or a transfer of a lien on that asset.

Additionally, the Tenth Circuit Court of Appeals has found that "a history of transactions with companies affiliated with the debtor company is sufficient cause for the appointment of a trustee where the best interests of the creditors require." Oklahoma Refining Co. v. Blaik (In re Oklahoma Refining Co.), 838 F.2d 1133, 1136 (10th Cir. 1988)(citing five bankruptcy court cases). In this case, the United States Trustee has demonstrated millions of dollars of intercompany transfers, most of which were 1) probably not made with sound business judgment, 2) against the interests of the creditors of and investors in the transferring companies, and 3) not disclosed to the investors[34]. See UST

_____

[34]For example, $6.0 million was transferred from Vaughan Capital, LLC to Vaughan Company Realtors. The Court seriously questions the Vaughan Capital, LLC manager's business judgment when it (an entity 100% owned and controlled by Debtor) transferred virtually all the money it received as invested funds in a private placement to Vaughan Company Realtors, a company owned 85% by Debtor. Debtor knew the financial condition of Vaughan Company Realtors. There was no evidence offered as to
(continued...)

Exhibit 5.  While it is true that Debtor was probably only a net recipient of transfers from the various companies, his refusal to testify regarding details of the various companies and their interconnections suggests to the Court that a trustee should be appointed to see if there are any possible claims for the estate.

**D.**	**CONCLUSION ON MOTION TO APPOINT TRUSTEE**

Debtor engaged in fraud.  There are also other reasons to convert the case.  Grounds exist under both 11 U.S.C. § 1104(a)(1) and (2) to appoint a trustee.

**II.**	**MOTION TO CONVERT**

In <u>In re Modanlo</u> the Bankruptcy Court for the District of Maryland set forth the process for a court to decide a motion to convert under the current version of Bankruptcy Code 1112:

> The mechanics of determining whether a court should convert or dismiss a case under the post-BAPCPA version of 11 U.S.C. § 1112(b) appear to be as follows: First, the movant must demonstrate that cause exists by a preponderance of the evidence.  At this point, if cause has been demonstrated, the court must ascertain whether unusual circumstances exist to prevent conversion or dismissal.  If no such unusual circumstances exist, the court must convert or dismiss.  The non-moving party is able to try to defeat a motion to convert or dismiss the bankruptcy case by showing that unusual circumstances exist to prevent dismissal or that factors specifically set out in § 1112(b)(2)(A) and (B)

---

[34](...continued)
whether any formal documents were drawn to evidence these transfers, whether they were interest bearing, whether they were secured, or even if they were authorized.  The investors that owned interests in Vaughan Capital, LLC who testified were all unaware of the transfers and unaware of any authority to make these transfers.

Case 10-10763-s7    Doc 343    Filed 05/20/10    Entered 05/20/10 15:28:17 Page 30 of 38

exist (_e.g._, reasonable likelihood of timely
confirmation, reasonable excuse for an omission by the
debtor).  If these exist, the opponent to the motion to
convert or dismiss prevails, unless the court
determines that the best interests of the estate are
otherwise.  And, the court must make this best
interests assessment even if the opponent does not
carry its burden or even make a defense.  Thus, if
cause has been demonstrated (and whether or not the
motion is opposed), the court must ascertain whether
the best interests of creditors and the estate are
served by granting or denying the motion.  _In re Hook_,
397 B.R. 544, 2008 WL 3906794, at *4 (10th Cir. BAP
Aug. 26, 2008) ("[ Section 1112(b)(1) ] allows the
court to deny the motion if doing so would be in
furtherance of the best interests of the creditors or
the estate.")(unpublished); _In re Orbit Petroleum,
Inc._, 395 B.R. 145, 148-49 (Bankr. D. N.M., 2008) ("In
this case, because a plan has been filed which purports
to pay all creditors in full as of the effective date
... neither conversion nor dismissal is in the best
interest of the creditors of the estate.").

_In re Modanlo_, 413 B.R. 262, 271 (Bankr. D. Md. 2009)(footnote

omitted).

Debtor's refusal to testify[35] at the first meeting of
creditors constitutes cause to convert as a "failure timely to
provide information ... reasonably requested by the United States
trustee." 11 U.S.C. § 1112(b)(4)(H). In closing argument,
Debtor argued that his taking the Fifth Amendment should not be
held against him because the United States Trustee could discover
the information itself without much trouble. The Court doubts
that the United States Trustee could discover the requested
information. Debtor is in the unique position of having the
information. That is not the issue, however. For one thing, the
statute does not read "failure timely to provide information ...
reasonably requested by the United States trustee unless the
trustee can discover the information itself without much
trouble." Secondly, for a chapter 11 debtor-in-possession,
absolute transparency is required.

_____

[35]In <u>McCormick v. Banc One Leasing Corp. (In re McCormick)</u>,
the Court of Appeals for the Eleventh Circuit ruled that invoking
the Fifth Amendment was not a sufficient ground, in itself, to
deny confirmation of an individual Chapter 11 debtor's plan.
<u>McCormick</u>, 49 F.3d 1524, 1527 (11th Cir. 1995). In that case,
however, the Debtor invoked the Fifth Amendment in a separate
adversary proceeding seeking to have a debt declared
nondischargeable under section 523, reached a settlement with the
creditor in the adversary proceeding, and then pursued
confirmation of a plan without further invoking the Fifth
Amendment privilege. <u>Id.</u> at 1526. The Court of Appeals vacated
and remanded for a determination of whether debtor's failure to
testify at a deposition in the adversary proceeding impeded the
basic bankruptcy administration of his case. <u>Id.</u> at 1527. In
Mr. Vaughan's case, he invoked the Fifth Amendment 121 times
during the 341 meeting. There is no question this impeded the
basic bankruptcy administration of his case.

The American bankruptcy system is often described
as having two primary objectives: first, ensuring the
equitable and timely repayment of creditors with valid
claims; and second, affording debtors a fresh start
once they emerge from bankruptcy. In re Ortiz, No.
05-39982, 2006 WL 2946500, at *9 (Bankr. S.D. Tex. Oct.
13, 2006) (quoting In re T-H New Orleans Ltd. P'ship,
188 B.R. 799, 807 (E.D. La. 1995), aff'd, 116 F.3d 790
(5th Cir. 1997)). In order for these twin goals to be
achieved-indeed, in order for the bankruptcy system to
function-every entity involved in a bankruptcy
proceeding must fully disclose all relevant facts. In
re Coastal Plains, Inc., 179 F.3d 197, 208 (5th Cir.
1999) ("The duty of disclosure in a bankruptcy
proceeding is a continuing one."); In re Ramirez, No.
03-47872, 2006 WL 3838176, at *3 (Bankr. S.D. Tex. Dec.
29, 2006) ("[T]he broad policy of the Bankruptcy Code
... favors transparency and disclosure whenever
possible."); In re eToys, Inc. 331 B.R. 176, 187
(Bankr. D. Del. 2005) ("Disclosure 'goes to the heart
of the integrity of the bankruptcy system.' ") (citing
In re B.E.S. Concrete Products, Inc., 93 B.R. 228, 236
(Bankr. E.D. Cal. 1988)); In re Century Plaza Assoc.,
154 B.R. 349, 352 (Bankr. S.D. Fla. 1992) ("Disclosure
of fees is a fundamental concept in bankruptcy.").

Sanchez v. Ameriquest Mortgage Co. (In re Sanchez), 372 B.R. 289,

296-97 (Bankr. S.D. Tex. 2007). See also Plaza de Retiro, 417

B.R. at 641 (One of the most fundamental and crucial duties of a

debtor-in-possession is to keep the Court and creditors informed

about the nature, status and condition of the business undergoing

reorganization.)(citing In re V. Savino Oil & Heating Co., Inc.,

99 B.R. 518, 526 (Bankr. E.D. N.Y. 1989)). Therefore, the Court

finds that Debtor's refusal to testify is "cause" to convert

under 11 U.S.C. § 1112(b)(4)(H).

        Once "cause" has been demonstrated, the Court must
convert or dismiss, unless the Court specifically
identifies "unusual circumstances ... that establish
that such relief is not in the best interest of

                        Page  -33-

creditors and the estate." 11 U.S.C. § 1112(b)(1).
However, absent unusual circumstances, the Court must
not convert or dismiss a case if (1) there is a
reasonable likelihood that a plan will be confirmed
within a reasonable time, (2) the "cause" for dismissal
or conversion is something other than a continuing loss
or diminution of the estate coupled with a lack of
reasonable likelihood of rehabilitation; and (3) there
is reasonable justification or excuse for a debtor's
act or omission and the act or omission will be cured
within a reasonable time. 11 U.S.C. § 1112(b)(2); 7
Collier on Bankruptcy ¶ 1112.04[1] (Alan N. Resnick and
Henry J. Sommer, eds., 15th ed. rev.2008).

Orbit Petroleum, 395 B.R. at 148.

The code does not define "unusual circumstances" within
the meaning of 11 U.S.C. § 1112(b). See [In re ]
Gateway Access [Solutions, Inc.], 374 B.R. [556] at 560
[(Bankr. M.D. Pa. 2007)] (acknowledging that the
statute does not define "unusual circumstances"); In re
Fisher, No. 07-61338-11, 2008 WL 1775123, at *5 (Bankr.
D. Mont. April 15, 2008)(" 'Although section 1112(b)
does not define the phrase "unusual circumstances," it
clearly contemplates conditions that are not common in
most chapter 11 cases.' ")(quoting 7 Collier on
Bankruptcy, ¶ 1112.04[3], p. 1112-26 (15th ed. rev.)).
Nevertheless, "the import of section 1112(b) is that,
if cause exists, the case should be converted or
dismissed unless unusual facts or circumstances
demonstrate that the purposes of chapter 11 would be
better served by maintaining the case as a chapter 11
proceeding." 7 Collier on Bankruptcy ¶ 1112.04[3], p.
1112-26 (Alan N. Resnick and Henry J. Sommer, eds.,
15th ed. rev. 2008).

Id. at 148-49.

In closing arguments, Debtor argued that the "unusual

circumstances" language of Section 1112 means that if there is a

good chance a plan will give creditors more money, then the Court

should not convert or appoint a Chapter 11 Trustee. Debtor did

not specifically argue that his plan constituted unusual

Page  -34-

circumstances but he made no other argument, so the Court presumes that this was the intended argument. The simple filing of a plan is not an unusual circumstance in Chapter 11. In re Wahlie, 417 B.R. 8, 13 (Bankr. N.D. Ohio 2009). Compare Orbit Petroleum, 395 B.R. at 149:

> In this case, because a plan has been filed which purports to pay all creditors in full as of the effective date of the plan, neither conversion nor dismissal is in the best interest of the creditors and the estate. A plan which proposes to pay all creditors in full on the effective date is an unusual circumstance sufficient to deny conversion or dismissal even in the face of demonstrated cause. Creditors and the estate will be far better off if the plan is confirmed than if the case were dismissed or converted. By affording the Debtor an opportunity to confirm a plan that proposes to pay all creditors in full, the purposes of the bankruptcy code to encourage financial restructuring and facilitate payments to creditors is furthered.

(footnote omitted.)

As discussed above, the plan in this case cannot be confirmed. Even if it could, the plan does not actually make any meaningful payment to the creditors. In fact, the Court finds it highly unlikely that any plan could be confirmed. Debtor has shown no other "unusual circumstances." In summary, the Court does not find "unusual circumstances" in this case that establish that the requested conversion or dismissal is not in the best interests of creditors and the estate. Therefore under 11 U.S.C. § 1112(b)(1) the Court "shall" convert or dismiss the case unless § 1112(b)(2) applies.

Page -35-

The conditions set out in Section 1112(b)(2) are not present. There is no likelihood that a plan will be confirmed with a reasonable period of time. This takes Section 1112(b)(2)(A) out of the picture. Section 1112(b)(2)(B) requires both a reasonable justification for the act or omission and a cure of the act or omission within a reasonable period of time fixed by the court. Debtor did not offer any remedial measures to cure his failures to disclose information such that complete information would be available within a reasonable time.[36] And he certainly did not offer to revoke his assertion of his Fifth Amendment privilege. Thus the standard of Section 1112(b)(2)(B) is also not met. Therefore Section 1112(b)(2) does not prevent the Court from converting the case.

## III  DECISION TO CONVERT

As discussed above, there are grounds to either appoint a trustee or convert the case to Chapter 7. From the discussion above, it is clear that Debtor cannot remain a debtor-in-possession.

---

[36]The pending SEC action is a civil proceeding, not a criminal proceeding. But should a federal criminal proceeding ensue (the possibility of which cannot be eliminated), it will be months if not years before Mr. Vaughan is beyond the stage where he need no longer invoke the Fifth Amendment privilege. This is simply too long a period for a personal chapter 11 reorganization to wait for disclosure and confirmation of a plan, so there is no point in the Court setting a deadline for Debtor to waive his Fifth Amendment privilege.

Case 10-10763-s7   Doc 343   Filed 05/20/10   Entered 05/20/10 15:28:17 Page 36 of 38

> Once the court determines that "cause" exists (and the Sections 1112(b) exceptions have not been established), Section 1112(b) offers a choice between converting the chapter 11 case to a case under chapter 7 or outright dismissal, "whichever is in the best interests of creditors and the estate," 11 U.S.C.A. § 1112(b) (West 2010).  "Also, instead of either dismissal or conversion, the court may appoint a trustee or an examiner, if such appointment is in the best interests of creditors and the estate."  Collier on Bankruptcy ¶ 1112.04[7], at 1112-39--1112-40.
>
> The Code does not define the phrase "best interests of creditors and the estate."  Presumably, the parties will be the best judge of their own best interests, and if all of the parties agree on one course of action, the court should accommodate their desire.  <u>Id.</u> at 1112-40 (footnote omitted).

<u>In re Van Eck</u>, 425 B.R. 54, 67 (Bankr. D. Conn. 2010).

In this case, all creditors that commented in writing (including the official committees of Noteholders in both cases and BBVA Compass Bank) are in favor of conversion.  The U.S. Trustee prefers conversion.

Debtor himself is not a business entity.  He was an employee of various companies he established.  Those companies are mostly out of business.  Debtor seems to have no ongoing business.  There are no funds to support a reorganization plan.  Debtor's only choice is to liquidate.  This is more easily accomplished in Chapter 7 by a professional panel trustee.  The Court will enter an Order converting the case to Chapter 7 and an Order denying the motion to appoint a Chapter 11 Trustee as moot.

Page  -37-

_[signature]_

Honorable James S. Starzynski
United States Bankruptcy Judge

Date Entered on Docket:  May 20, 2010

Copies to:

Douglas F Vaughan
PO Box 70009
Albuquerque, NM 87197

Alice Nystel Page
Office of the U.S. Trustee
PO Box 608
Albuquerque, NM 87103-0608

Ronald Andazola
Assistant U.S. Trustee
PO Box 608
Albuquerque, NM 87103-0608

Susan Vandiver
for the Creditor Committee
PO Box 36112
Albuquerque, NM 87176

George M Moore
for the Note Holder Committee
Moore, Berkson & Gandarilla, P.C.
PO Box 7459
Albuquerque, NM 87194

William F. Davis
for the Vaughan Co Realtors Note Holder Committee
6709 Academy NE, Suite A
Albuquerque, NM 87109